UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERI MOYER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEGG, INC., a Delaware corporation; and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. 22-cv-09123-JSW<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAYING CASE**<br><br>Re: Dkt. No. 16 |

Now before the Court for consideration is the motion to compel arbitration filed by Chegg, Inc. ("Chegg"). Having reviewed the parties' papers, relevant legal authority, and record in this case, the Court hereby GRANTS the motion to compel arbitration and STAYS all further litigation pending the completion of arbitration.

**BACKGROUND**

Defendant Chegg is a leading online learning platform that provides students with educational materials, including textbooks for sale or rent. (Dkt. No. 16-2, Declaration of Wentao Xu ("Xu Decl.") ¶ 2.) Since 2016, to use Chegg's services, a user must create a Chegg account and agree to Chegg's Terms of Use ("TOUs") by clicking the "Create account" button. (*Id.* ¶¶ 3, 4.) Chegg makes its TOUs available to its users on its "Create an account" pop-up screen:

(*Id.* ¶¶ 4, 9.)

On this screen, a user must click the "Create account" button to create a Chegg account. (*Id.* ¶ 9.) Immediately below the "Create account" button is a notice that states: "We respect your privacy. By clicking "Create account" you agree to the Terms of use and Privacy Policy." (*Id.*) The notice appears in black font against a white background with the phrases, "Terms of Use" and "Privacy Policy," appearing in blue, hyperlinked text. (*Id.* ¶¶ 5, 9.) A user who clicks the hyperlinked TOUs on the "Create an account" pop-up screen is given access to those terms. (*Id.* ¶ 5.) A disclaimer appears in bold and all-caps towards the top of the TOUs that states:

"**IMPORTANT! PLEASE CAREFULLY READ THESE TERMS OF USE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS.**" (*Id.*, Ex. A at 006.) Relevant here is the thirty-first section labeled "**Dispute Resolution**," which is also referred to as the "**Arbitration Agreement**." The agreement states, in relevant part, that:

> Accordingly, you and Chegg agree that any dispute, claim or controversy between us arising out of or related to the Terms of Use or the breach, termination, enforcement, interpretation or validity thereof, of the Services or your use of the Services (collectively, "Disputes") will be finally settled by individual binding arbitration in accordance with this "Dispute Resolution" section, and not in a court of law. This "Dispute Resolution" section shall also be referred to as the "Arbitration Agreement."

2

(*Id.* at 020.)

The first page of Chegg's TOUs also contains an "**ARBITRATION NOTICE**." (*Id.* at 006.) The notice contains a class action waiver in bold and all-caps, stating "**YOU AGREE THAT DISPUTES BETWEEN YOU AND CHEGG WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASSWIDE ARBITRATION**." (*Id.*)

Chegg allows users to "opt out of arbitration" by providing written notice to Chegg within 30 days of first receiving the TOUs. (*Id.* at 020.) The "**Dispute Resolution**" section of the TOUs states, "If you do not provide Chegg with an Arbitration Opt-out Notice within this thirty (30) day period, you will be deemed to have knowingly and intentionally waived your right to litigate any Dispute in court except as expressly set forth with respect to individual actions in small claims courts." (*Id.*)

The American Arbitration Association's ("AAA") rules, including the AAA's "Commercial Arbitration Rules," are incorporated into the Arbitration Agreement. (*Id.* at 021.) Those rules state: the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, validity of the arbitration agreement or to the arbitrability of any claim or counterclaims" and the "arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." AAA Commercial Arbitration Rules, R-14(a), (b). The AAA rules are not provided in the arbitration agreement but are accessible on the AAA's website, www.adr.org. (*Id.*)

On or about August 29, 2022, Plaintiff Sheri Moyer purchased an "e-textbook" from Chegg's website, www.chegg.com. (Dkt. No. 1, Compl. ¶ 13.) Plaintiff alleges after her "e-textbook" purchase, Chegg enrolled her into an automatic renewal subscription that charged her $19.99 on October 17, 2022. (*Id.*) Plaintiff alleges she was unknowingly enrolled in Chegg's "e-textbook" automatic renewal and continuous service offer in violation of California Consumer Legal Remedies Act, California Civil Code section 1750 *et seq.*, and California's Unfair Competition Law, California Business and Professions Code section 17200, *et seq.* (*Id.* ¶¶ 1-4.) Plaintiff brings this case on behalf of herself, and all persons similarly situated. (*Id.* ¶ 23.) She

3

1  seeks certification of the following class, "All persons in the United States who purchased a
2  product or service from Chegg as part of an automatic renewal plan or continuous service offer
3  within the four years prior to the filing of this Complaint." (*Id.*)

4  Chegg now moves the Court to compel Plaintiff to arbitrate her claims. The Court will
5  address additional facts as necessary in the analysis.

**ANALYSIS**

**A.   Applicable Legal Standard.**

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A court must "stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing 9 U.S.C. § 3). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court[.]" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4). The FAA reflects a "liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). A court's role is thus limited to determining two issues: "whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen*, 763 F.3d at 1175. "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Here, the parties do not dispute that Chegg's arbitration agreement, should it be found enforceable, encompasses Plaintiff's claims. The issue is whether a valid arbitration agreement exists.

**B.   An Arbitration Agreement Exists Between Plaintiff and Chegg.**

Chegg argues the Court must compel arbitration because the Arbitration Agreement delegates arbitrability disputes to the arbitrator and incorporates the AAA's Commercial Arbitration Rules. Plaintiff disagrees. She asserts that before the Court can assess whether these

4

issues were properly delegated, the Court must determine if an arbitration agreement exists. Plaintiff contends no such agreement exists because (1) Chegg did not put Plaintiff on inquiry notice of its Arbitration Agreement and (2) Plaintiff did not unambiguously manifest her assent to arbitration.

### 1. The Court Decides Whether an Arbitration Agreement Exists.

The incorporated AAA Commercial Arbitration Rules state that the "arbitrator shall have the power to rule on his or her jurisdiction, including any objections with respect to the *existence*, scope, or validity of the arbitration agreement[.]" AAA Commercial Arbitration Rules, R-14(a) (emphasis added). The next question is who determines whether an arbitration agreement exists – a court or an arbitrator – when the AAA Commercial Arbitration Rules are incorporated in a delegation provision of the Arbitration Agreement.

Generally, parties can agree to arbitrate threshold issues concerning the arbitration agreement because it "is simply an additional, antecedent agreement[.]" *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010). However, a court should not "assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations omitted) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). Many courts, though not all, have held that the incorporation of the AAA consumer rules into an agreement is clear and unmistakable evidence of the parties' intent to arbitrate arbitrability. *See, e.g.*, *JPay, Inc. v. Kobel*, 904 F.3d 923, 936-37 (11th Cir. 2018); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 992 (N.D. Cal. 2017); *cf. Brennan v. Opus Bank*, F.3d 1125, 1130 (9th Cir. 2015) (holding that incorporation of the AAA rules into an *employment* contract constituted "clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability").

While parties can typically delegate threshold issues such as *validity* and *scope*, a party who "contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the *existence* of an agreement to arbitrate. Only a court can make that decision." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991) (emphasis in original). Indeed, Section 4 of the FAA mandates a court be satisfied

1  that an arbitration agreement exists before compelling arbitration. 9 U.S.C. § 4 ("[U]pon being
2  satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make
3  an order directing the parties to proceed to arbitration in accordance with the terms of the
4  agreement.").

5  Numerous circuit and district courts that have addressed this same threshold issue have
6  reached the same conclusion. *See, e.g., MZM Constr. Co., Inc. v. New Jersey Building Laborers*
7  *Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020); *In re: Automotive Parts Antitrust*
8  *Litig.*, 951 F.3d 377, 385-86 (6th Cir. 2020); *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d
9  225, 234 (4th Cir. 2019); *Lloyd's Syndicate 457 v. FloaTEC, LLC.*, 921 F.3d 508, 514-16 (5th Cir.
10 2019); *Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737 & n.2 (8th Cir. 2014); *Taboada*
11 *A. v. AmFirst Ins. Co.*, No. 3:18-CV-883TSL-RHW, 2019 WL 3604613, at *3 (S.D. Miss. Aug. 6,
12 2019); *CCC Info. Servs. Inc. v. Tractable Inc.*, No. 18-C-7246, 2019 WL 2011092, at *2 (N.D. Ill.
13 May 7, 2019); *King v. AxleHire, Inc.*, No. 18-cv-01621-JD, 2019 WL 1925493, at *2 (N.D. Cal.
14 Apr. 30, 2019); *Olivas v. Hertz Corp.*, No. 17-cv-01083-BAS-NLS, 2018 WL 1306422, at *4-5
15 (S.D. Cal. Mar. 12, 2018).

16 The Court thus concludes that it is for a court to decide whether an arbitration agreement
17 exists even where a delegation provision submits this issue to an arbitrator.

18 **2.     An Arbitration Agreement Exists Between Plaintiff and Chegg.**

19 The Court must still determine whether an arbitration agreement exists between Plaintiff
20 and Chegg. As the moving party, Chegg bears the burden of proving an arbitration agreement
21 exists by a preponderance of the evidence. *See Norcia v. Samsung Telecomms. Am., LLC*, 845
22 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th
23 Cir. 2014)). To determine whether the parties agreed to arbitrate, the Court applies ordinary state-
24 law principles that govern contract formation. *First Options*, 514 U.S. at 944. Here, California
25 law governs. To form a contract under California law, "there must be actual or constructive notice
26 of the agreement and the parties must manifest mutual assent." *Oberstein v. Live Nation Ent.,*
27 *Inc.*, 60 F.4th 505, 512-13 (9th Cir. 2023) (citing *Berman v. Freedom Financial Network, LLC*, 30
28 F.4th 849, 855 (9th Cir. 2022)). "With the rapid growth of the internet and e-commerce, courts

6

have been required to apply these traditional contract principles to novel forms of agreement." *Id.* at 513; *see Berman*, 30 F.4th at 855-56 ("[E]lemental principles of contract formation apply with equal force to contracts formed online.")

The most "straightforward application of these principles . . . involves 'clickwrap' agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *See Oberstein*, 60 F.4th at 513 (quoting *Berman*, 30 F.4th at 856). "Courts routinely find clickwrap agreements enforceable." *Id*. "At the other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only though a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* "Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.* "When an online agreement falls between these two extremes, courts analyze mutual assent under an objective-reasonableness standard." *Id.*

Plaintiff contends the agreement at issue here is a "browsewrap agreement," in which Chegg's website offers terms that are disclosed only through a hyperlink and require no affirmative action from the website user indicating his or her consent to those terms. The Court disagrees with Plaintiff's characterization. The manner in which Chegg presents its TOUs on its "Create an account" pop-up screen resembles what courts have termed: "modified" clickwrap agreements.[1] Under these agreements, users are notified of the existence of the website's terms of use and advises a user that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020). Courts have found these types of agreements valid "where the existence of the terms was reasonably communicated to the user." *Meyer*, 868 F.3d at 76 (collecting cases); *see also Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC(KSC), 2014 WL 6606563, at *3 (S.D. Cal. 2014) (terms were blue and hyperlinked);

---

[1] Some courts also refer to these types of agreements as "hybrid design" or "sign-in wrap" agreements. *See, e.g.*, *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019).

7

*Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (terms were underlined and hyperlinked); *Swift v. Zynga Game Network*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (terms were blue and hyperlinked); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-cv-04825-JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005) (terms were underlined and hyperlinked).  By contrast, courts are less willing to find a user has constructive notice when the terms are less conspicuous. *See, e.g., Oberstein*, 60 F.4th at 515.

### a. **Constructive Notice.**

As discussed above, the Court may find an enforceable agreement where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* (quoting *Berman*, 30 F.4th at 856).

To satisfy the first part of the test, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id*.  The court examines "conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design" when determining "whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id.* (quoting *Nguyen*, 763 F.3d at 1177).  As discussed above, Chegg's Terms are a "modified" clickwrap agreement, a hybrid between a pure clickwrap agreement and pure browsewrap agreement.

Chegg argues Plaintiff received constructive notice of and affirmatively agreed to Chegg's TOUs when she created a Chegg account.  On the "Create an account" screen, a conspicuous notice appears directly beneath the orange "Create account" button that a user must click to create an account on Chegg's website. (Xu Decl. ¶ 9.)  The notice unambiguously states: "By clicking Create account you agree to the Terms of use and Privacy Policy."  The notice appears in black writing against a white background with the phrase, "Terms of use," in blue, hyperlinked text. Moreover, very minimal text or imagery appears on the same page.  (*Id.*)  Based on these facts, the Court finds that a reasonable user would be placed on constructive notice of Chegg's TOUs. Chegg also submits evidence demonstrating that Plaintiff created a Chegg account on August 28,

8

2022. (*Id.* ¶ 11.) Chegg provides an image of the Chegg "Create an account" screen that accurately reflects the "Create an account" screen encountered by Plaintiff when she created an account. (*Id.* ¶ 9.) The Court concludes that Plaintiff received reasonable notice under these circumstances. *See, e.g., Lyles v. Chegg, Inc.*, No. CV RDB-19-3235, 2020 WL 1985043, at *4 (D. Md. Apr. 27, 2020) (concluding that the layout of Chegg's Sign up page reasonably communicated the Terms of Use).

Plaintiff nevertheless argues she did not receive notice because Chegg's TOUs appear at the bottom of the "Create an account" screen, in small font, with nothing to call attention to them. Plaintiff states that the TOUs are simply underscored and insufficient to alert a reasonably prudent user that a clickable link exists. In support of that proposition, Plaintiff cites *Berman*, 30 F.4th at 856, and *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 453 (2021).

In *Berman*, the court found the agreement at issue to be invalid for failing to include features that would alert a reasonable user to its existence. "[T]he [*Berman*] court emphasized that the text disclosing the existence of the terms was printed in an inconspicuous tiny gray font and found that the mere underlining of hyperlinked terms and conditions was 'insufficient to alert a reasonably prudent user that a clickable link exists.'" *Oberstein*, 60 F.4th at 516 (quoting *Berman*, 30 F.4th at 857). The court noted, however, that "[c]ustomary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) . . . which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Berman*, 30 F.4th at 857.

"In *Sellers*, a California appellate court similarly found a hybrid agreement invalid because of the enforcing party's failure to provide reasonably conspicuous notice of the agreement." *Oberstein*, 60 F.4th at 516. "There, too, the court emphasized the insufficiency of merely underlining a hyperlink to an agreement, stating that it was 'not set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters.'" *Id.* (quoting *Sellers*, 73 Cal. App. 5th at 481). "The court also considered 'the context of the transaction' and the placement of the notice." *Id.* (citing *Meyer*, 868 F.3d at 80). "Unlike a user who signs up for an account and 'clearly contemplate[s] some sort of continuing relationship,' the users of the

1    website at issue were merely attempting to start a free trial, making it less likely that they would
2    'scrutin[ize] the page for small text outside the payment box or at the bottom of the screen linking
3    them to 26 pages of contractual terms.'" *Id.*
4          The principles set out in *Berman* and *Sellers* support Chegg's argument that its "Create an
5    account" pop-up screen contains features sufficient to provide reasonably conspicuous notice of
6    Chegg's TOUs. In contrast to the agreements invalidated in *Berman* and *Sellers*, Chegg's TOUs
7    were distinguished in bright blue, a clear indication of a hyperlink. The TOUs were also located
8    directly below the "Create account" action button. Also, "in contrast with the noncommittal free
9    trial offered in *Sellers*," Plaintiff's transaction required a full registration process, which reflected
10   the "contemplation of 'some sort of continuing relationship' that would have put users on notice
11   for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517 (quoting *Sellers*,
12   73 Cal. App. 5th at 477).
13         Accordingly, the Court finds Plaintiff here received constructive notice of Chegg's TOUs,
14   including the arbitration provision, when she created an account in August 2022.

          **b.**      **Unambiguous Manifestation of Assent.**

16   Next, this Court must determine whether Plaintiff took some action that unambiguously
17   manifested her assent to the agreement. Plaintiff claims that she did not unambiguously manifest
18   her assent, because she did not create a Chegg account by clicking on the "Create account" button,
19   instead clicking on the Google icon and bypassing the "Create an account" pop-up screen. (Dkt.
20   No. 20-1, Declaration of Sheri Moyer ("Moyer Decl.") ¶¶ 5, 6.) Plaintiff further claims that she
21   never saw or clicked on the statement containing the TOUs, so therefore had "no knowledge of
22   Chegg's Terms of Use, nor the arbitration provisions allegedly contained within them." (*Id.* ¶ 7.)
23   Plaintiff also claims that when she "placed [her] order on Chegg's website, [she] did not know that
24   Chegg was trying to get [her] to agree to arbitrate." (*Id.* ¶ 8.)
25         Plaintiff's argument that she did not manifest her assent because she never saw or clicked
26   on the hyperlink containing the TOUs and "did not know that Chegg was trying to get [her] to
27   agree to arbitrate" is a direct contradiction of contract law. "[A] party's failure to read a contract,
28   or to carefully read a contract, before signing is no defense to the contract's enforcement." *Desert*

10

1  *Outdoor Advert. v. Superior Court*, 196 Cal. App. 4th 866, 872 (2011) (*cited with approval in*
2  *Bulnes v. Suez WTS Servs. USA, Inc.*, No. 22-CV-1154-BAS-AHG, 2023 WL 3262938, at *13
3  (S.D. Cal. May 4, 2023)).  "[C]ourts must presume parties understood the agreements they sign,
4  and that parties intended whatever the agreement objectively provides, whether or not they
5  subjectively did."  *Roldan v. Callahan & Blaine*, 219 Cal. App. 4th 87, 93 (2013) (*cited with*
6  *approval in Bulnes*, 2023 WL 3262938, at *13)

Plaintiff also argues that she did not click the "Create account" button, but instead clicked



the Google icon, which bypassed the "Create an account" pop-up screen.  Chegg contends that even if Plaintiff clicked on the Google icon to create a Chegg account, the pop-up screen continues to display language disclosing the TOUs hyperlinked in blue font.  (*See* Dkt. No. 23-1, Declaration of Wentao Xu in Support of Reply ("Xu Reply Decl.") ¶ 10.)   Chegg proffers evidence that after the Google account information is entered, the user is still required to click on the "Create account" button with the same disclosure, "We respect your privacy.  By clicking Create account you agree to the Terms of use and Privacy Policy."  (*Id.* ¶ 11.)

11

1    (*Id.* ¶ 8.)

2    The declaration of Wentao Xu submitted on reply is evidence that Plaintiff clicked the
3    "Create account" button and, indeed, that it would have been impossible for her to create an
4    account without doing so. In his original declaration, Xu also states that "[a]ccording to Chegg's
5    records, Plaintiff did not use an Apple, Facebook or Google account to create her Chegg account."
6    (Xu Decl. ¶ 10.) Xu attests that he is responsible for Chegg's product platform and architecture,
7    including the "Create an account" screen, and is familiar with Chegg's business records. (*Id.* ¶ 1.)
8    Plaintiff declared under penalty of perjury that she "*never clicked the 'Create account'*" option;
9    instead she clicked on the Google icon, which bypassed the account setup screen. (Moyer Decl. ¶¶
10   5, 6.)

11   A motion to compel arbitration is akin to a motion for summary judgment, because the
12   district court's order compelling arbitration "is in effect a summary disposition of the issue of
13   whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen v.*
14   *LMB Mortgage Services, Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting *Par-Knit Mills, Inc. v.*
15   *Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980)). "To prevail under the summary
16   judgment standard, Defendant must show there is no genuine issue as to any material fact
17   regarding formation of the arbitration contract." *Harris v. DoorDash, Inc.*, No. 21-CV-09445-
18   JSC, 2023 WL 3324688, at *2 (N.D. Cal. May 9, 2023). In *Harris*, DoorDash provided a
19   screenshot of the company's sign-up process that showed plaintiff must have clicked "Get Started"
20   to create a DoorDash account and agree to the arbitration clause. The screenshot was provided as
21   evidence in a motion to compel arbitration. The plaintiff argued that he never signed an
22   arbitration. The district court ruled that DoorDash showed there was "no genuine issue as to any
23   material fact regarding formation of the arbitration contract." 2023 WL 3324688, at *2.

24   Here, based on the evidence submitted, there is no genuine issue of fact concerning
25   Plaintiff's assent to Chegg's TOUs. The "Create an account" screenshot submitted by Chegg
26   demonstrates that Plaintiff must have clicked "Create account" even if using the Google icon
27   option. Plaintiff's sole reliance upon her declaration does not dictate otherwise.

28   The Court concludes Plaintiff received constructive notice of the arbitration agreement and

assented to its terms by clicking the "Create account" button when she created her Chegg account. Accordingly, an arbitration agreement exists between Plaintiff and Chegg.

## CONCLUSION

For the reasons stated, the Court GRANTS Chegg's motion to compel arbitration and STAYS all further litigation pending completion of arbitration. The parties shall file a joint status report every 180 days apprising the Court of the status of the arbitration proceedings, including when the stay may be lifted. The parties shall alert the Court within five court days of the completion of arbitration.

**IT IS SO ORDERED.**

Dated: July 25, 2023

JEFFREY S. WHITE
United States District Judge